Our final case of the morning is 24-11310, Benjamin Watson v. Kingdom of Saudi Arabia. Good morning, Your Honors. May it please the Court, Stephen Vladek for the appellants. When Congress enacted the Justice Against Sponsors of Terrorism Act in 2016, it was explicit that its goal, as quoted on page 40 of our opening brief, was to provide litigants with, quote, the broadest possible basis to seek relief against foreign countries that have provided material support to foreign terrorist organizations or persons that engage in terrorist activities against the United States, unquote. To that end, justice operative provision, which we quote on page 44 of our opening brief, overrides foreign sovereign immunity for claims arising out of injuries that were caused both by an act of international terrorism in the United States and the tortious conduct of a foreign sovereign or its officers or agents, regardless of where that conduct occurs. Appellant's complaint alleges the paradigmatic JASTA case. No one disputes that the NAS Pensacola shooting was an act of international terrorism on U.S. soil. No one disputes that the perpetrator, Mohammad Alshamrani, was an active duty officer in the Saudi Air Force who had access to NAS Pensacola, indeed, who was allowed into the United States at all, solely because of the Saudi government's selection, vetting, and supervision of him as part of a weapons systems officer training program for which the kingdom had contracted with the United States. And no one disputes that Alshamrani was able to access building 633 on the morning of December 6, 2019, while in uniform and on duty, only because of the kingdom's employment and support. And yet, even though the complaint is replete with detailed allegations concerning the myriad ways in which the kingdom, its officers, and agents provided material support, both to Alshamrani himself and to AQAP, and even though appellants also plausibly alleged a number of intentional torts by Alshamrani and gross negligence by the country liaison officer, all of which would independently fall within the non-commercial tort exception to the FSIA, the district court granted the kingdom's motion to dismiss this case in its entirety. Not only was this error, your honors, but it is difficult to imagine how any JASTA case could survive a motion to dismiss if this one can't. So with regard to JASTA, I think the relevant place to start is the question of causation, right? The district court also suggested that JASTA did not apply because the attack was outside the scope of Alshamrani's employment. We have pointed out that that's error. I don't take the kingdom to be disputing that at this point. Rather, the question for causation- I wasn't as sure about that, so I actually did have some questions on that front. Are you saying that it's undisputed that he took this act within the scope of his employment? I understand he was wearing his uniform and et cetera, but under Florida law, it takes more than that, right? Right. So Judge Grant, I think there are two different points here. The first is for purposes of JASTA- Oh, I see what you're saying. And specifically our causes of action under the Anti-Terrorism Act, the question is not whether the perpetrator was acting within the scope of his employment. The question, if I might quote from section 1605BB2, which again is on page 44 of our opening brief, the question is whether the official employee or agent of the foreign state who committed the underlying tortious acts were acting within the scope of their employment. So at least, Judge Grant, for JASTA, we don't think scope of employment is at issue. For the intentional torts- I'm not sure I understand that. You've jumped a little bit too quickly for me. And I'm also looking at 1605B, a tortious act or acts of the foreign state or of any official employee agent of the foreign state while acting within the scope of his or her employment. Now there is more than one Saudi employee we could be referring to, but let's start with the shooter. Well, with respect, Judge Marcus, for purposes of the Anti-Terrorism Act claims, the question is about the kingdom's liability, not the shooter's liability. And so again, if I might just briefly separate- You're talking about under 1605B. That's right. But so we have invoked JASTA as an exception of foreign sovereign immunity principally with respect to- But I'm asking a slightly different question. I'm asking whether the shooter was acting within the scope of his employment. That's fair. So that is a relevant question. It isn't surely the only question that's relevant regarding scope. But help me with that one. How was- and this was the thrust, I think, of Judge Grant's question. How was the shooter acting within the scope of his employment when he shot up the naval base at Pensacola? So again, I think this goes- this bears most directly on our non-commercial tort claims, on the intentional torts. But on the intentional torts, we believe that Alshamrani was acting within the scope of his employment under Florida law because Florida law- and I don't think there's a dispute between the parties as to what Florida law says. Florida law recognizes that, to quote the first DCA in Hennigan, conduct may be within the scope of employment even if it's unauthorized. If it is of the same general nature as that authorized or incidental to the conduct authorized. In Hennigan, your honors, that was about a traffic stop in which the police officer molested the individual whom they pulled over. If molestation of a suspect is within the scope of employment as the first DCA held in Hennigan, this seems to be just the same case where you have an individual who had apparent authority, like the police officer, because of his uniform, who had access to building 633, like the officer had the ability to pull over the suspect in Hennigan, because of his- But the difference, at least arguably, is this. A police officer who has the authority to pull someone over for speeding or something like that and then goes too far is- it arises out of the employment that he's performing. The argument is here, the shooter was sent over here to learn how to fly F-35s or whatever, learn how to speak English, and learn how to fly equipment that the authorities were buying. What the question is, is how does the shoot- the act of shooting arise out of this kind of employment for this kind of purpose? Or maybe I'm misstating it. So again, I mean, I think Judge Marcus, I want to say two things. The first is, I think this- the district court should be reversed, even if you disagree with me on this, and I'd like to get to that. But to answer your question directly, the police officer in Hennigan was not doing anything within the scope of his employment when he molested the suspect. The question was, was he in a position to commit the tort only because of his employment? And that seems to be very closely parallel to this case. Judge Marcus, here you had al-Shamrani not just in a position, the sort of- his presence in the United States, his participation in the program, his access to the building, his ability to store a gun and ammunition on a U.S. military base were all things that were only available to him by dint of his Saudi employment. But again, Your Honors, I want to be as clear as possible. Even if you're not persuaded by that, that's only a problem. I understand. For our intention. And I didn't mean to throw you off what you- what is plainly a stronger argument that you have, so why don't you go right to it? So, we think- I mean, just- there's a lot going on in this case. We think there really are two buckets of claims that are the ripest for reversal. One, Judge Marcus, is our intentional tort claims with respect to the non-commercial tort exception. But the even stronger set, Your Honors, is our ATA claims and how they fall within the JASTA exception. So back to Judge Marcus' question. For JASTA purposes, scope of employment is relevant only for the underlying tort feasors conduct. And so with respect to the multiple claims we've alleged in the complaint for material support to Al-Shamrani, for material support to AQAP, for financing of a terrorist organization, the relevant officials there are not Al-Shamrani. The relevant officials there are the Saudi government officials who vetted Al-Shamrani, who approved his application, who are a part of the material support that we've alleged in the complaint to Al-Shamrani. And frankly, Your Honors, we don't take the kingdom to be seriously disputing that, right? Their principal argument about JASTA is not scope of employment. Their principal argument is causation. And so we think that the JASTA claims are by far the most obvious place where Judge Rogers' decision should be reversed and remanded. If I might pivot briefly to the causation point. So I think the parties agree that the relevant standard for causation under JASTA is not but for. It's a slightly different standard. It's whether the kingdom's actions were a substantial factor in the sequence of events that led to the appellant's injuries and whether those injuries were reasonably foreseeable or anticipated as a natural consequence of the kingdom's actions. We have dozens of paragraphs in the complaint where there are lots of allegations, allegations that are substantiated by media accounts, by US government reports, by examples of other cases that suggest all of the ways in which the kingdom was not just a negligent bystander, but that it actually was actively involved in facilitating Alshamrani's behavior in the United States. If I might direct the court to just one example. In paragraph 65 of the complaint, which Your Honors will find at page 38A of the appendix, we talk about the DS-164. This is the form that had to be filled out on behalf of Alshamrani before he could ever receive an A2 visa. That form, Your Honors, includes 55 different security questions that the kingdom or its officers had to answer in order to secure a visa for Mr. Alshamrani. Security questions about his radicalization, security questions about whether there was any behavior in his past that raised questions about his suitability for a visa. And so, you know, the kingdom tries very hard throughout this case to suggest that it was just, you know, done wrong by a rogue employee. The allegations in the complaint are decisively to the contrary. Does turning a blind eye meet the causation standard, if that's what Saudi Arabia did? I don't think, Judge Pryor, that turning a blind eye would get us all the way there. I think it's worth noting that just refers to omission, right? And we think that the allegations in the complaint, if we take as true, I mean, just to remind the court, we're here on the grant of a motion to dismiss. The district court dismissed on legal grounds, not factual grounds. And so the well-pleaded allegations in the complaint should be taken as true. We don't think the complaint can possibly be fairly read as suggesting that this was turning a blind eye on the kingdom's part. The kingdom had dozens of mandatory duties that we've identified in the complaint. The kingdom, as I just mentioned, Judge Pryor, filled out Al-Shamrani's DS-160 application, which included 55 questions that they had to affirmatively answer in order to gain access to the United States. And, Judge Pryor, I just, I think that the point that I would like to sort of harp on here is the implications, if it were otherwise. It really does beggar belief that the United States would enter into this kind of arrangement with a foreign sovereign to allow individuals of the nationality of the foreign sovereign into the United States for sophisticated weapons and avionics training and impose no burden on the foreign sovereign to screen the individual, impose no responsibility. Let me back up and ask just a couple of questions that you can help me with. Time is short. You're on my time, not yours now. So just help me with this. To the extent we're talking about 1605, talk about 1605B in a moment, but to the extent we're talking about non-commercial tort exception to FSIA. Under 5A, it says that the paragraph shall not apply to any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function. I want to talk about that and ask this with regard to the kingdom itself. The kingdom decided to send this Air Force officer to the United States. They could have decided to send any number of others. Was that not a discretionary act? I'm choosing him by itself, Judge Marcus, might have been, but... It would have to be, wouldn't it? Again, I think stripped of context, yes, but representing on the DS-160... No, no, I understand, but I'm just... So to the extent that they sent this guy over rather than that guy, that's judgment. That's clearly a discretionary call. It seems to me that's indisputable. Up until the point that the kingdom is making affirmative representations about his background, up until the point at which, you know, we've alleged in the complaint, Judge Marcus, that the kingdom had obligations to vet even before selecting these programs. I think, Judge Marcus, part of the problem here is that we're at such a premature stage of this case. We have alleged... No, no, I understand. I understand that, but the theory behind the Foreign Sovereign Immunities Act, immunity is to cut it at the pass, right at the beginning. It's like the defense of qualified immunity. The law says we stop it at the beginning, so there isn't discovery in all this other business. That's certainly true for the run-of-the-mill FSIA case, Judge Marcus. I agree with that, but the reason why I started my presentation this morning with the text of JASTA is because JASTA, I think, was deliberately meant to upset that understanding, at least, again, at least for those claims long within JASTA. So, for the non-commercial tort exception, yes, we think we have a bit of a harder time to show that at least some of those claims should survive. But the other thing I wanted to ask you about the statute under 5, which still, I'm still on 1605A5. It requires that, quote, occurring in the United States, let's assume that the Saudis screwed up here big-time. They didn't properly vet the guy, and they sent the wrong guy. Didn't that occur elsewhere? So, even if that did, Judge Marcus, the CLO, the country liaison officer, was here. His obligation to supervise the Saudi officers at Pensacola was here. The requirement we allege in the complaint that he had to search their barracks periodically was here. Help me with that, because I think that, just talking for myself, reading the complaint and reading the statute, the best argument you have is that the Saudis sent a CLO over, and he was missing in action. He did not do his job, and among the things he was obliged to do was not only to maintain contact, but also to assist in routine inspections of IMS and their assigned quarters. Plainly, he didn't do that. That's, I think, the strongest claim you have. I may be wrong about that, and I'm happy to be convinced that I've misapprehended it, but I want to talk about that one, because that struck me as the best claim that you had. Were the Saudis required to send a CLO over in the first place? So, we allege in paragraph 170 of the complaint that they were, and we haven't seen the contract, Judge Marcus, so we're just dealing with what's plausibly alleged in the complaint, but in paragraph 170 on page 67a of the appendix, yes, we allege that a CLO was required. In paragraph 171 and 172, we talk about the various regulations and internal policy. Here's the problem. When I looked at the Security Assistance Management Manual, chapter 10, and you, and you, and it's quoted in the, in the complaint in paragraph 171. I don't read that as requiring them to send a CLO over. Seems to me, if they send a CLO over, then the CLO has certain obligations, but I did not find, and you can help me where I ought to find, that they were obliged to send a CLO over. So, the reason, bear with me just to complicate it a little further. I looked at the TA manual, which was also cited, and I looked at D, country liaison officer, CLO, at the request of another country, and with the concurrence of the Navy International Program offices, etc., etc., a CLO may be assigned. The language is wholly precatory, and then it says, when a CLO is not assigned, suggesting that it wasn't obligatory, when a CLO is not assigned for a particular country, the country's senior NBS, located at the training activity, may be used in this capacity. So, it struck me that it was purely precatory, and if the kingdom chose not to send a CLO over, that wouldn't be a tortious act. They were free to do that, in other words, as a discretionary act. There was nothing in the rules and regs that required them. Have I misread this? So, I mean, I think there is a debate about that, Judge Marcus, because the Navy report concluded otherwise, and the Navy report, at one point, if I recall correctly, suggested that there was an obligation. But, Judge Marcus, even if that's not sufficient for your purposes, the kingdom did send a CLO. Okay, so let's talk about that. So, they send him over, and then when I looked at what you alleged, you said they sent him over, but between the critical period of time, between July, when presumably the shooter bought the weapon and got the license, and December 6th, when the shooting rampage occurs, during that five-month period of time or so, the CLO is only here for a maximum of 15 days. He's here from August 19th to the 29th, and then the Saudis pull him and send him back, and then he comes back in September, and he's here from the 15th to the 21st, and the Saudis pull him back again. So, during that five-month period of time, he's only here 15 days, and if it was purely precatory, then the misconduct on the part of the CLO had to occur during those 15 days, unless I've misunderstood this. I mean, I guess, Judge Marcus, we're a bit sort of beyond the parameters of the complaint at this point. No, I'm reading from what you allege in the complaint. No, I just mean with respect to what would have happened, right, if the CLO had been present. I think there are two points that are worth stressing, and I realize I've gone way over, and I appreciate it. That's all right. You're helping us, and it's an important case, so you lay it out for us. So, I think there are two critical points here. The first is, the reason why it matters in all of the discretionary function cases, that the individual, the government officer who had discretion, chooses to exercise it, is because that creates reliance interests. And so, the assumption is that once the Saudi government, Judge Marcus, even if it didn't have to send a CLO, chose to, that the relevant U.S. officers could have faith that the Saudis were supervising themselves, right? So, I don't know that you can just, Judge Marcus, count the days he's- Let me ask the question in a slightly different way. Zeroing in on what your claim is. Is the claim that the CLO didn't properly assist in inspection during the period of time he was here, those 15 days, or is the claim that the Saudis grievously erred by not having him here for the rest of that period of time? We've alleged both, Judge Marcus. And just to drive home the consequences here, had an inspection of the barracks been performed at this point, the inspection would have uncovered the firearm, it would have uncovered the ammunition, this entire tragedy could have been avoided. And so, we have plausibly alleged any number of obligations that the CLO had, that the kingdom had vis-a-vis the CLO. I just want to stress for the court, you know, I guess I have a slight disagreement with Judge Marcus about what our strongest claim is. I think our strongest claims are the ATA claims under JASTA, where none of those factual disputes, Judge Marcus, are relevant. Where the question is simply, have we plausibly alleged that the kingdom's conduct was a substantial factor leading to the attacks on December 6th? And so, I'd be happy to address that further on rebuttal, but I just think that we believe the district court should have allowed at least jurisdictional discovery, Judge Marcus, on what the contract says about the CLO. That clearly would have aided in some of the questions Your Honor is now asking. We believe that on the intentional torts, we've met Florida law at least at the motion-to-dismiss stage. And we think that the most obvious place where the district court should be reversed is on our ATA claims and the JASTA exception. Why don't, why don't you walk us through that? I think you were going to do that at the beginning. Why don't you do it now? Sure. So, Judge Grant, we have, I believe there are five different causes of action in the complaint that allege violations of the Anti-Terrorism Act. It's counts, I'm sorry, it's, yes, counts two through six of the complaint. And just to pick out two of them. So, count three alleges that the kingdom provided material support to Al-Shamrani himself in violation of 18 U.S.C. 2339a, that's the predicate statute. That statute simply requires proving, once we get to the ability to prove things, that the kingdom provided or knew it was, knew or should have known that it was providing support to Al-Shamrani. And, Judge Grant, our allegations with regard to that are all of the things the kingdom did to facilitate Al-Shamrani's involvement in the program. And just to distinguish my exchange with Judge Marcus, for JASTA purposes, it doesn't matter which of those things took place here and which of those took place in Saudi Arabia. JASTA is explicit that the location of the tort is irrelevant. It's why Congress enacted JASTA. So, we think we've plausibly alleged, for purposes of JASTA, count three, which is the ATA claim about material support to Al-Shamrani. We think we've plausibly alleged in count four, material support to AQAP itself, both through the support to Al-Shamrani and through the broader support that we allege the kingdom has provided to AQAP in Yemen. And, Your Honor, what is critical about our JASTA claims, as well, is that Congress, deliberately, in 2016, meant to expand the scope of liability in contrast to what was then the prevailing law under the non-commercial tort exception. The whole reason why JASTA exists, Judge Grant, is because Congress wanted to override, in a very small subset of cases, the limits in the non-commercial tort exception that Judge Marcus has been pointing to this morning. I mean, we're certainly aware of that fact, but that doesn't mean, they were very, it's a very specific statute, and you still need to meet all the requirements for overriding that immunity that typically applies. I mean, that's, of course we do, and I just, I think that if the question is, have we met all of the facts, all the relevant statutory factors, I think that question answers itself. I mean, just to go back to the question that the text of the statute, to 1605 BB, which again is on page 44 of our opening brief, we need physical injury to person or property or death occurring in the United States. We have that. We need an act of international terrorism in the United States. We have that. We need a tortious act or acts of the foreign state or any official employee or agent of that foreign state within the scope of their employment, regardless of where those acts occurred. Judge Grant, we have plausibly alleged dozens of tortious acts that would meet that requirement, and the only reason why Judge Rogers disagreed with us on this point is she suggested that our allegations were conclusory. With respect, I think the complaint is quite detailed, given how little information we have at this stage about what the kingdom knew and when. If plaintiffs in a case like ours, Judge Grant, can't at least get jurisdictional discovery on some of those questions in a context in which the kingdom has the relevant information, not the plaintiffs. It's not clear how you could ever have a case under JASTA not withstanding Congress's clear intent to expand liability in that space. In this context, what about the question of acts of omission, right? How do you show that Saudi Arabia, the kingdom's acts, were not acts of omission that you've alleged? So let's set aside the AQAP in Yemen. I'm not necessarily convinced of how relevant that is, but with respect to just the assailant here. So first, I mean, again, the underlying ATA violations, Judge Grant, are criminal statutes that the predicates for those are affirmative conduct, not omission. But second, just to distill this down to a very concrete point, again, just take the DS-160 application. It's not an act of omission to answer 55 security questions in a way that's inconsistent with information that we've alleged the kingdom already had in its possession. That's not an act of omission. That is a willful or at least knowing misstatement of what they had in their possession. And so it just seems to us that given what we've alleged in the complaint, given how much the complaint is based on allegations, and they're just allegations, of affirmative choices by the kingdom and its officers, representations by the kingdom and its officers, and so on, duties, right, by the kingdom and its officers, to suggest that this is all just based on acts of omission, I think is to really demean, right, the brunt of the complaint and the crux of the allegations. Let me follow up, if I might, on Judge Grant's question. She cited the rule of construction D, where it refers to an omission, or a tortious act, as the latter part of the clause I wanted to ask you about, or acts that constitute mere negligence. It's an interesting way that they, Congress, phrased it, mere negligence. Is there an allegation here that they did something more than act negligently? That is to say, they negligently failed to vet, they negligently sent the wrong guy, and maybe they negligently didn't have a CLO officer here throughout the entire period of time. But are there allegations of acts that go beyond mere negligence, and would that include gross negligence? I don't even know whether gross negligence is different from mere negligence, or they mean to be referencing an intent, more intentional kind of conduct. Can you help me with that? Sure. I mean, so let me just preface this by saying this was not what Judge Rogers held below, and I understand much of my friends' arguments. But, um, first, I think there's no question, Judge Marcus, that the fair reading of the phrase mere negligence is meant to distinguish gross negligence. And one of our allegations, one of our causes of action in the complaint, is specifically gross negligence on the part of the CLO. Um, but second, and again, I mean, I, I, it's a bit awkward to be trying to sort of suggest in an appellate court that the facts, that the allegations say what they say, but we have alleged in dozens of paragraphs. So that's what I want you to tell me. Tell me what you have alleged specifically in this 170-page complaint that says or suggests the conduct was not negligent or merely negligent, but willful, intentional. So in paragraph 138, we allege that the kingdom throughout al-Shamrani's service with the Royal Saudi Air Force knew of his postings to his social media accounts that involve enormous amounts of radical fundamentalist ideology. It involved anti-American and anti-Jewish ideology. It involved a number of aggressive comments that should have been alarming to anyone. We've alleged, Judge Marcus, that the kingdom didn't just, not just that the kingdom should have known, the kingdom did know about al-Shamrani's social media history. We've alleged in paragraph 156 that the CLO and the other Saudi trainees at Pensacola knew that al-Shamrani had a weapon and significant ammunition in violation of both US and kingdom policies, and that they all had a mandatory obligation to report what they knew in that circumstance. What paragraph did you say that was? I'm sorry, that's paragraph 156, Judge Grant. We allege in paragraph 159 that the kingdom knew of the CLO's departure, Judge Marcus, back to our prior exchange, and deliberately chose not to send someone else to supervise the individuals. We allege in paragraph 160 that the kingdom knew about the ominous message al-Shamrani posted on his Twitter account on September 11th, 2019, and so, Judge Marcus, these are not just acts of omission. These are the kingdom continuing to provide support and continuing to make it possible for al-Shamrani to literally be in the United States at a time when they knew all of these things that should have led them to conclude exactly. Clearly acts of commission, not omission, that are alleged. I was simply asking whether they were acts of intent or acts of negligence. You can negligently fail to pick something up on a social media site and so on and so forth. To satisfy the Anti-Terrorism Act, which again is the predicate cause of action for most of our JASTA claims, Judge Marcus, we have to show more than negligence. Violations of the Anti-Terrorism Act depend upon affirmative conduct by the defendants, and so that will be our burden if we get a remand to the district court, is to prove the allegations, but to read the complaint and suggest that this was all just negligence on the kingdom's part, I think is really to take a remarkably record-defying view of what happened here. And if I might just say one last thing, the, you know, it's worth stressing in the progress of the government's investigation, the critical moment was when the FBI unlocked al-Shamrani's cell phone and gave access to the cell phone, about which there's a lot in the complaint. You know, Judge Marcus, it's entirely possible that if we had sued based solely on what was known up to the point of the FBI not unlocking the cell phone, some of the concerns Your Honor has raised this morning would be present. But given what the government itself discovered when it unlocked al-Shamrani's cell phone, given how much involvement and communication and planning and awareness there had been, to suggest that this was just a kind of negligence, I think is to not give the complaint the deference it's due, given the posture of this case. Thank you very much. Good morning, Your Honors. Gregory Rapaway for the Kingdom of Saudi Arabia. Thank you and may it please the Court. Mohamed al-Shamrani was a rogue actor who committed a horrific attack on behalf of the terrorist organization al-Qaeda. His acts were a crime not only against his victims and not only against the United States, but also against his own country, the Kingdom of Saudi Arabia. Saudi Arabia immediately and fully cooperated with the United States investigations into the attack, conducted by the Navy and by the FBI. Those agencies' investigations, which are cited extensively in the complaint and about which you heard a lot just now, found that al-Shamrani acted alone and that no one outside of al-Qaeda itself knew of his plans, including the other Saudi individuals who were present at the base. Plaintiffs' theories in this case have shifted a great deal at each stage, and they've failed to preserve many of those theories for review. I would say the core of this case is an accusation of a wrongful failure to prevent a terrorist attack. The District Court correctly ruled that the Foreign Sovereign Immunities Act, bars jurisdiction over claims based on Saudi Arabia's allegedly negligent hiring, retention, supervision of al-Shamrani. And the Federal Tort Claims Act, to be clear, would bar similar claims against the United States as it did in the Harper case, arising out of similarly tragic forefootage. But he alleges more than negligence. Well, if you go to paragraph 138, he alleges something more. He said they knew and did nothing. So I think that allegation is conclusory, Your Honor. I'm happy to turn to paragraph 138 with you. I mean, so at 138, he posted radical fundamental ideology on his social media accounts. They talk about ideology, they talk about sentiments, they talk about friends who followed him, but they did not they do not allege, other than in conclusory form, that Saudi Arabia knew that he was either planning to commit a terrorist attack or that he was associated with al-Qaeda. And that is what they have to show to establish a tortious act, which is a jurisdictional predicate under the JASTA exception that my friend relies upon. How could, let's let's assume for purposes of argument that it's true. How could they show that at the pleading stage? Wouldn't that require discovery to really be able to show that? Not necessarily, Your Honor. In terrorism cases like this one, the plaintiffs are frequently able to rely on, and they have relied on, reports from the government. In this case, Saudi Arabia fully cooperated with the government's report. Had that report found that Saudi Arabia knew that he was a, that al-Shamrani, who was a member of al-Qaeda, that Saudi Arabia knew that he was planning... Of course, we're not bound by a naval report or an FBI report. No, Your Honor. We're looking at the four corners of the complaint. We're asked to say if we accept the allegations as true and pled with sufficient detail and specificity, do they state a claim and provide an exception to FSIA? That's really what we have to look at now, right? Yes, Your Honor, with a one point that I do think that the, that there is a fair case for incorporation of reference by the reports here. But even if you disagree with that... Do you mean because they reference the naval and FBI reports at least in some degree and in some ways? Yes, for example, they say that there was information on the phone. This is in paragraphs 320 and 341 of their complaint. They referenced specifically the investigative finding that there were communications with al-Qaeda on the phone. They leave out in the same part of the investigation, we cite this in our brief, that those communications were made using end-to-end encryption to avoid discovery. So to the extent that you're considering the plausibility that Saudi Arabia would have been aware of those communications, I think you should consider the additional fact that they were encrypted, which is part of the same source on which they rely. I think that's fair under ordinary 12b6 rules. What about the public? What about the public postings related to, say, 9-11 and other concerning postings? Why wouldn't that be enough? So I think you have to divide those into two categories. First, there are the ones that he, they are the alleged social media postings at the time that he was being selected or vetted and the allegations that Saudi Arabia would have seen those in the, in the course of that vetting. But the allegations about what those complaints were are actually quite conclusory and vague, contrary to my friend's description. I'd point the court to paragraphs 116, 121, 132, 136 of the complaint. It's, they talk about radicalization. They talk about sentiments. Those are easy things to say. They do not say that Saudi Arabia could have, even if it had found all of those tweets known at that time that he was an al-Qaeda member. Now, after he was in the United States, there are... Do you think that if Saudi Arabia had indeed seen those messages and tweets that they would have been authorized to put the, this person in the position that they put him in? I think that, so I don't know exactly what the tweets said because they're not alleged with clarity in the complaint, but I think that if Saudi Arabia had been aware of that material, they might well have reached the same conclusion that they did with regard to the other officers who had some anti-material, American material on their phone, which is that it's conduct unbecoming of an officer. And that would have been an act of military supervision or discipline. So you're saying that Saudi Arabia could lawfully put someone in this position who expressed the views that were expressed in those public postings? I'm saying that there would be... No, actually, Your Honor, I would put it this way. I would say, had Saudi Arabia done that, then the United States would have had every right to come to Saudi Arabia and say, why did you do this? You know, why would you send this person here and demand an explanation, government to government? But I am saying, Your Honor, that there is no jurisdiction over a civil tort suit for exercise of that discretionary function under the non-commercial tort exception. And as far as JASTA is concerned, there's no jurisdiction under that civil tort suit because it doesn't rise to the level of knowledge that he was a member of the terrorist organization or that he was planning to commit a terror... or that he would use the support for a terrorist attack. You've jumped, I think, to a few different... a few different rationales there. But if we're looking at the question of whether there was more than mere negligence, are you saying that if a country was fully aware of the postings that are alleged in the complaint, it would not be an act of mere... of more than mere negligence to still put the person forward for this position? I don't think... I don't think more than mere negligence has been pleaded on that point, Your Honor, because of the vagueness. And again, I'm talking about the tweets in Saudi Arabia at the time of the... of the vetting. But I also don't think more than mere negligence has been pleaded with regard to failure to discover the tweets. I mean, the assertion is made in the conclusory fashion that Saudi Arabia knew about them. I understand. I'm asking you to assume for purposes of this question not to agree that the complaint adequately pleaded. I'm not asking you to concede that, but to assume that if the complaint had adequately pleaded that Saudi Arabia absolutely was fully aware of all the material that they say was publicly available, would that qualify as more than mere negligence to put him forward in this way? For more than merely available before he went... came to the U.S., I would still make the argument, Your Honor, but I concede it would be a harder argument for me. Let me ask the question this way. Help me with what the statute means. We're talking about JASTA now, and we're talking about D, the rule of construction, and the requirement... the... the exception, if the tortious act or acts constitute mere negligence. That's how Congress wrote the law, the adverb mere negligence. Suppose the act is grossly negligent. Would this exception apply? So we briefed the issue... this issue in the... before the magistrate... the district... Right. And we said, yes, it's got to be reckless, and they said, well, gross negligence would be enough, and the magistrate judge did not need to reach the... What do you say? I would say, yes, it's supposed to capture at least some form of intent. I don't... I don't think... So you think gross negligence isn't enough to state a claim? Yes, although that would be my position, yes. Is there anything in the history of this statute that explains the phrase mere negligence? I am not aware of anything in the history of the statute. This particular statute was passed kind of in a hurry at the end of 2016, and there wasn't a lot of foreplay on it. Let's suppose, for the purposes of my question, that mere negligence was meant to be in counterpoint to gross negligence, rather than in counterpoint to intent. In other words, let's just suppose gross negligence would state a claim. Just assume that for the moment. Would they not have said enough in the complaint to state a claim for acts of gross negligence on the part of the kingdom for having failed to pick up public comments and tweets that suggested a whole lot of things about how radicalized he had become and what potential danger he may have posed, whether he had anything to do with al-Qaeda or the Arabian Peninsula or not. I can concede that, Your Honor, but it does not help them. Why not? It doesn't help them because in order... because that... then mere negligence is an exception to JASTA. But the affirmative portion of JASTA that conveys the jurisdiction in the first place requires a tortious act or acts. And the torts which they have pleaded to satisfy JASTA are torts for material support of terrorism. Those torts themselves have an intent requirement of knowledge. That's actually conceded in the... Right, they pleaded that, but they pleaded more, did they not? Didn't they say in word... look, they took a shotgun, blasted the wall, and hoped to hit something. One of the things they said with clarity was that the kingdom really failed big-time in vetting this guy, that there was a whole lot of stuff out there. It wasn't hard to find. You didn't even need encryption to find this stuff. And their failure to discern that was grossly negligent. Let's assume that's their claim. Why doesn't that stay the claim under JASTA? Because taking your honor... well, then your honor, I would switch, because you just talked about their failure to discern. They really should have found it, but they didn't. They failed to do it. Well, they also did... the co-mission was in representing A, B, C, and D in the DS-160 application. That's at least the allegation. That's an act of co-mission, not omission. And if they had known what they should have known, if they knew or should have known it, they couldn't possibly have said what they said in the 160 application. That's what he's arguing. I mean, that's the inference he would have us draw from the complaint. If they had known what they should have known. Yeah. And I think at that point I have to fall back on the insufficiency of the allegations, your honor, and say, you know, there are these very general allegations. I cited the paragraphs about Islamic radicalization and Islamic sentiments. We don't know what that means. Later, they cited more specific tweets that were right before, on September 11th, and then right before the attack. The failure to catch those I would defend as an omission. But at the time of the co-mission that you're talking about, selecting him and sending him to the United States, the allegations are vague and conclusory, and they don't show more than mere negligence. Do they have an obligation to correct a statement in the DS-160? If they didn't know originally, and then they'd learn because of a subsequent series of tweets, did they not have an obligation to come back to the United States Navy and say, we got a problem here, we're hooking this guy and sending him back to the kingdom? Or at least warn the the naval officers to take a closer look? That would have been a failure to warn, so that goes back to being an omission. So no, no jurisdiction on that theory either, your honor. An omission, a failure and a duty to correct would unquestionably be an omission. Thank you. I do want to talk a little bit about the material support allegations as well, because they were mentioned extensively. And I also want to call in particular the court's attention to the district court's alternative finding at page 278A in footnote 30, that there is no evidence to support the material support allegations. And here is where we get to the sort of unique procedural nature of the FSIA. We had made both a facial and a factual challenge before the magistrate judge. The magistrate judge ruled on the basis of both, the district court largely only ruled on the basis of the facial challenge. But with regard to the Yemen allegations, she very clearly said, also there's no evidence to support this, and I'm not going to authorize discovery into it because it would be, I'm paraphrasing, but they haven't shown a basis for discovery into it. So the Yemen allegations, I think, are also out as a matter of fact. And the challenges to the lack of jurisdictional discovery, I think, do not survive review under an abusive discretion standard. They had given the, not only did the magistrate judge find that they'd failed to plead a prima facie case, but he also found that they gave him over broad buckets of discovery that he gave them a chance to narrow explicitly on the record at pages 699 to 709 of the appendix, they didn't take that chance. And so they can't really complain to this court now that they should have gotten narrow targeted discovery that they deliberately did not ask, the district court or the magistrate judge for. In fact, the only specific thing they asked for in appeal as opposed to more generalities is the contract. And at page 61 of their opening brief, they concede that any allegation that the contract might contain a waiver is speculative. I also want to correct the representation that you heard that the Navy report did not found that there was a mandatory duty to provide the CLO. Page 355A of the appendix states in the Navy report that no agreement exists. So there would have been an agreement, the Navy said, had there been an agreement it would have been non-binding. And this is with regard, I should, I'm sorry, I jumped too fast. With regard to the CLO, a mandatory duty to provide the CLO, Navy report did not find that. Navy report found that any such duty would have been in an agreement and that no such agreement existed. And that if the agreement had existed, it would have been non-binding. Let me stop you at that point and ask you a little bit about that if I can. He alleges it's mandatory. The language cited here suggests it's precatory, not mandatory. Let's assume it's precatory. They could send, they weren't obliged. But in fact, they did send. They sent the CLO here and during some of the critical period of time in August and September, just after he buys, gets a license, a hunting license and buys the Glock pistol, there's a CLO here. And they allege that the CLO failed to properly maintain contact and failed to properly assist in the inspection of the barrack quarters of the shooter. Why isn't that sufficient to state a claim? Because the CLO did not have a mandatory, the duties of the CLO, even if you think the CLO is there, even once the CLO is there, there is no mandatory duty to supervise in a particular fashion. Let me stop you on that one. I looked at the TA manual and it speaks of the following obligations of a CLO if he is there. And among the things that it says under 3D is that he's going, the CLO shall, it's not, doesn't say may, D, maintain contact with the IMSO. That's I guess the student office and the IMS, that would be the shooter. And then it says under H subsection I that he shall assist in routine inspections of the IMS and their assigned quarters. If they had gone in there, they'd have found the firearm, the clips and the ammunition. Isn't that right? If they had, I mean, the allegation is. Allegation is. Right, the allegation is that he bought a Glock, he bought ammunition clips, and he bought hundreds of rounds of ammunition, and they allege specifically, if I have it right, that he stored it in the barracks, right? They allege that, yes. Right, so we have to take that as true for these purposes. That's certainly delineated with specificity. There's nothing abstract or general about that. He bought a gun, he bought a clip, he bought ammo, and he kept it in the barracks. The only other thing they say about that is perhaps from time to time he also had the firearm in a helmet bag that he carried around Pensacola. That's, if my recollection is right, that's what they've said. So the Saudis having sent the guy here, and him having been here at least some of the relevant period of time, and him being obligated to assist in searching the barracks, why isn't that enough to take it away from any problem with discretionary function? Because, Your Honor, the TA manual and all of the manuals that the plaintiff cited are manuals that regulate the conduct of the U.S. military in conducting the international training operations. And the magistrate judge discussed each policy and found that it was directed to units or commanders. I don't have all the sites in front of me, but I can tell you that they're at pages 229A to 232A of the appendix, which is the magistrate judge's opinion. And then the district court conducted a Danova review and agreed with those findings. That's at pages 282A and 283A. Right. But what I'm talking about in the TA manual puts an obligation on the CLO, not just on the Navy and its folks. Are you saying that when they wrote here that the CLO shall assist in routine inspections of the IMS and their assigned quarters, that wasn't precise, specific, and mandatory? It was not mandatory on the government of Saudi Arabia, which is being, which is the. Who was it mandatory on? It was mandatory. They shall assist. It was mandatory on the, that was giving a direction to the U.S. military command on what the CLO was supposed to do. If there was a CLO and those duties were supposed to be specified in agreement with Saudi Arabia and the Navy, and there was no such agreement here. The Navy found there was no such agreement. If it had existed, their practice would have been to make it non-binding. So that manual doesn't bind Saudi Arabia, both because on its face it's directed to the U.S. military, and also under the Ninth Circuit's Broidy decision, which correctly holds that the source of discretions, or the source of limitations, excuse me, on a foreign sovereign's policy discretion have to come either from its own domestic law, that's Saudi law, or international law, not from U.S. law. We cite that in our briefs, and I think it is sufficient to dispose of all the manuals, in addition to the fact that by their face, they are certainly creating a structure and telling you how things are supposed to work, but they're telling the U.S. military command how those things are supposed to work, and then for the foreign sovereign to be bound, there's supposed to be a separate agreement. Do we know from the record that we have in front of us the complaint in these manuals, whether and how often the barracks were inspected? Whether by the CLO, the CLO supervisor, or by Navy personnel? There are certainly allegations that they were not inspected often enough, Your Honor. Well, that's obvious. I don't, I cannot bring to mind as I stand here a paragraph, what's more specificity on it than that, perhaps my friend will be able to. Thank you. I'm aware that I'm over my time. I believe that we have, I've covered the point, unless the court has further questions. Well, it's become, this isn't where the argument has focused for, I think, good reason, but I would like to hear your response to the suggestion that this act was done in the scope of employment, under Florida law, of course. So, we disagree with their reading of Florida law. I would point the court to Spencer, actually both sides cite Spencer, which creates a three-part test and states that each of these three requirements must be met. It has to be the kind of conduct the person was employed to perform, it has to be in the time and space that the duties were supposed to be performed, and it has to be at least in part for a purpose to serve the employer. What if the person, on that third prong, what if the person misunderstands his service in furtherance of the purposes of the employer, right? What if this person thought that the kingdom would like for him to take this action and he thought that he was doing it in service of his role within that government? Even if he's incorrect, what does that mean for this test? So, I think that you would, I don't think that a mere irrational belief on an individual's part would be enough to charge the employer with their conduct, but certainly that would be a closer case, but I actually don't think that's properly alleged here. I think that the, if you look at the complaint as a whole, and you look at the fact that the emphasis on the importance of the security relationship between Saudi Arabia and the United States, you look at the fact that he is alleged to have been a flight student and is alleged to have been sent there for military training, you look at the longstanding strategic partnership between Saudi Arabia and the United States, which actually that's not entirely in the complaint, but it is in the Department of State reports that we cite in our brief. I think you would need, maybe not extraordinary evidence, but extraordinary allegations to prove that he thought that he was helping Saudi Arabia by doing this, and there is a very obvious Twombly-style alternative explanation, which is that we know he was loyal to Al-Qaeda. Al-Qaeda very much wants to disrupt the relationship between Saudi Arabia and the United States. It's one of their major goals, and so he had a, he could, the most, the only plausible, I would say, explanation for what he was doing is that he was serving that purpose, but I will maintain that we don't even get there because they failed the first requirement under Spencer, which is the kind of conduct that he was employed to perform, and I want to address the Hannigan case, which my friend cited. I think if you look at Hannigan at page 750, this is in the 467 Southern Second, they say that at least at the motion-dismissed stage in that case, it could have been overzealousness, the officer's search could have been overzealousness, meaning that although it was alleged to be a sexual assault, the officer could have had in mind that he was searching this person really thoroughly, perhaps, for contraband. Honestly, that sounds a little implausible to me, even on those facts, but that's what the court found. It could have been overzealousness, and the, and Iglesia distinguishes Hannigan because in that case, the search itself was part of the duties, and so the overzealousness could have been, it was in performing duties the person was supposed to perform, that is to say, arrest and search. There is no allegation in this complaint that Alshamrani was employed to shoot people, much less US people. He was going to be a pilot, he was taking training as a pilot, and he wasn't even supposed to be carrying a gun. As we've discussed extensively in the context of the non-commercial tort claims, he wasn't even supposed to be carrying a gun, so how could it possibly have been part of his job to attack people? And I do think the best analogy here goes back to the, well, the Fort Hood case, I'm sorry, is a discretionary function case. I do think that's a good analogy, but it's on a separate topic. So for that reason, I think that if you look at the magistrate judge's opinion at pages 201A to 2083, you look at the discussion of Iglesia, the Iglesia and Agroturf cases, as well as the Suorna case under New York law, I think this access theory that you've heard from my friend, the theory that it's sufficient for the employment to give the access to commit the tort, that is not adopted by Hennigan. It is not an accurate statement of Florida law, and it may be the law in some other states, but it's not the law in Florida, and for that reason, the analogy to Hennigan fails. I have one final question for you, and again, it's the construction we should put on, we're talking about JASTA, we're talking about D, rules of construction, a foreign state shall not be subject to the jurisdiction of the courts of the United States under subsection B on the basis of an omission or, and it's the clause after that I want to ask you about, a tortious act or acts that constitute mere negligence. You say we should read that mere negligence to be in counterpoint to intentional conduct. He says we should read it as in being in counterpoint to gross negligence. Can you tell me why, in your view, we should read it the way you suggest? Yes, Your Honor, because I think the torts that I will say Congress had in mind, but had in mind as shown by the text of JASTA itself, were material support torts, and there is no tort for grossly negligent material support. The material support torts that are clearly contemplated by this statute, that were the subject of the 9-11 litigation that was the trigger for this statute, are all, as is common ground between the parties, and I point again to the concessions on pages 51 to 53 of their brief, all knowledge torts, intent torts. So I think that's good evidence that Congress did not intend to sweep in a sort of grossly negligent theory, even if you could characterize the torts that occurred here as acts of commission, to the extent that some of the torts are acts of commission rather than acts of commission. Although you would concede the text itself doesn't necessarily yield that conclusion. The text itself can be read to include just comparing it to gross negligence and more, or just comparing it to intent. The language doesn't answer the question, does it? The pure language of subsection D does not answer the question. You would have to look to other parts of the statute to go by that. Thank you. Thank you, Your Honors, and I would respectfully urge that the judgment be affirmed. Thank you very much, Judge Pryor. May it please the Court. Judge Marcus, if I could return really briefly to your colloquy with Mr. Oppowee. On page 48 of our blue brief, I think we answered your question, which is that when Congress adopted 1605 B.D., it was codifying case law in the 9-11 case that had already established that the requisite standard is whether the tortfeasor's conduct was, quote, knowing or with deliberate indifference. And so we believe, Judge Marcus, that the or deliberate indifference, which is in the 9-11 ruling that we cite at the top of page 49 in our blue brief, and that was reflect—I think if Your Honor reads that case, you'll see that the district court was referring to why Congress adopted that language, was to encompass the possibility that you would have a case like this one, where the negligence, such as it is alleged, was so extreme that it's just implausible that the government had no obligation to do any of this. Turning to obligations for a moment, you know, my friend at various— Does the adverb mere help your argument anyway? As I suggested, I think, during my opening presentation, Judge Marcus, I think it does, and I think that's part of why the district court in the 9-11 case read the statute that way. Judge, again, I just want to point out, it was not a fluke that this was the language Congress adopted in Josta. Congress was picking and choosing which of the district court rulings in the 9-11 case it wanted to codify and which ones it wanted to overturn. Judge, this is one of the ones they wanted to codify. And I think that should—it's not binding on this court, of course, but I think it's strongly probative. If I could turn briefly to the—my friend at various points alluded to our inability to establish particular obligations because we can't establish an agreement. We've sought jurisdictional discovery of the contract in this case, which may very well bear upon the question of whether further representations were made about supervision, about monitoring. Judge Marcus, about whether there would, in fact, be a CLO, despite what Your Honor views as the precatory language of the Navy Manual. What about the suggestion that any heightening of a discretionary standard has to come from a country's domestic law or international law? I mean, so I'll first note that the Kingdom did not brief that in this court, Judge Grant. That's not our understanding of how the ATA cases have worked in practice. That's not our understanding of the 9-11 case. Of course, we'd be happy to provide additional briefing if the court would be interested. But, Judge Grant, I don't think that that has been how any of these ATA cases have been understood. Indeed, Judge Grant, just last term, the Supreme Court actually had to intervene in the Twitter case to clarify that the U.S. understanding of secondary liability for aiding and abetting was the appropriate question, was the appropriate standard. That seems consistent with our view of the statute, not with the Kingdom's. I know my time is short. I just have two other brief points, if I may. The first is, with regard, Judge Grant, to your questions about serving the master. Again, we are up in this court on a motion to dismiss. We plausibly alleged in various respects how we think Al-Shamrani believed he was serving the Kingdom through his attacks. This is in paragraph 5 of the complaint, paragraph 188 of the complaint. Of course, it will be our burden to prove that. But we actually think the Spencer test is well satisfied by the allegations in our complaint. And then last, if I might just close by pointing out, your honors, this is only the second case of which I'm aware in which this provision of JASTA has been invoked. We're fortunate that these cases are few and far between. We are fortunate that there are not a lot of acts of international terrorism on U.S. soil to which a foreign sovereign can be even loosely connected, even allegedly connected. But Congress was quite clear that its goal in that context was to provide at least for more litigation so that we can be sure that these foreign sovereigns are not facilitating acts of international terrorism on U.S. soil. The Kingdom's position in contrast is that the United States necessarily vested the Kingdom with unfettered discretion over the vetting, retention, and supervision of an individual to whom the United States not only provided access to highly sensitive U.S. military facilities, but also entrusted with elite and proprietary weapons and flight training. Your honors, if anything is implausible in this case, it is that the United States would ever have consented to such an arrangement. Thank you very much. Thank you. Court will be in recess until 9 a.m. tomorrow morning.